UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MJJG Restaurant LLC, Restaurant Row Waterway, LLC, and RT Entertainment, LLC, | ) ) ) ) | Civil Action No.: 4:13-cv-0885-BHH |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **Opinion and Order** |
| Horry County, South Carolina, Rennie Mincey, in her official capacity as Horry County Zoning Administrator, Horry County Board of Zoning Appeals, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |
| _____ | ) | |

This matter is before the Court on the defendants' motion for summary judgment (ECF No. 87) and the plaintiffs' motion for summary judgment (ECF No. 101). For the reasons set forth below, the defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

## BACKGROUND

The following allegations and facts are drawn from the plaintiffs' Second Amended Complaint (the "Complaint") (see ECF No. 48) and from the exhibits attached to the parties' submissions on the motions for summary judgment.[1]   The plaintiff RT

---

[1] These submissions include the defendants' motion for summary judgment with additional attachments (ECF Nos. 87-91), the plaintiffs' opposition to the motion for summary judgment (ECF No. 100), the defendants' reply in support of their motion for summary judgment (ECF No. 113), the plaintiffs' motion for summary judgment (ECF No. 101), the defendants' response in opposition to the plaintiffs' motion for summary judgment (ECF No. 114), and the plaintiff's reply

Entertainment, LLC ("RT Entertainment") was or is the operator of a "restaurant/nightclub" known as the Gold Club ("Gold Club I"), located at 2554 Jason Boulevard (the "Jason Boulevard Property").  (See Compl. ¶ 35; ECF No. 23-1 at 5.)  It is undisputed that The Gold Club I has been operating in its current location for a number of years.

The plaintiff MJJG Restaurant, LLC ("MJJG") is the proposed operator of a second "restaurant/nightclub," which would also be known as the Gold Club (the "Gold Club II"). It appears that the owner RT Entertainment and operator of the Gold Club I, Michael Rose ("Rose"), is also the owner of MJJG and proposed operator of the Gold Club II.  (ECF No. 23-1 at 5.)  The proposed site of the Gold Club II is a parcel located at 9719 N. Kings Highway (the "Kings Highway Property"), which is owned by the plaintiff Restaurant Row Waterway LLC, ("Restaurant Row").  The Kings Highway Property is in an area of unincorporated Horry County zoned HC Highway Commercial, where restaurants and bars are permitted as of right.  (Pl. Ex.[2] 23, Dep. of Rennie Mincey at 30-31.)  Prior establishments located on the Kings Highway property included "Thee Dollhouse," which presented erotic dance performances until it was forced to relocate,[3] and "The Afterdeck," an outdoor nightclub.  (Pl. Ex. 23, Dep. of Rennie Mincey at 37-42.)

---

in support of their motion for summary judgment (ECF No. 120).  For ease of reference, these documents and the numerous exhibits attached thereto are cited by their ECF number.
[2] Judge Lewis held a hearing on the plaintiff's motion for a preliminary injunction on January 9, 2014, and the plaintiffs cite the record from those proceedings in support of their summary judgment submissions.  The abbreviation "Ex." refers to the exhibits admitted into evidence at the preliminary injunction hearing held on January 9, 2014.The abbreviation "Tr." refers to the transcript page from that hearing.
[3] The operation of Thee Dollhouse was also the subject of substantial litigation.  *See Rest. Row Associates v. Horry Cnty.*, 335 S.C. 209, 516 S.E.2d 442 (1999); *Rest. Row Associates v. Horry Cnty.*, 327 S.C. 383 489 S.E.2d 641 (Ct. App. 1997) *aff'd as modified,* 335 S.C. 209, 516 S.E.2d 442 (1999).

**The Ordinances**

This case involves a challenge to former and current zoning ordinances and a licensing ordinance adopted by the Horry County Council to regulate the operation of adult businesses.  When MJJG initially sought to open the Gold Club II, the location of adult businesses was regulated by Chapter 526 of the Horry County Zoning Code ("Former 526").  As will be discussed, in September of 2013, the Horry County Council passed ordinances amending Former 526 and replacing it with new provisions ("Current 526").  The County Council also passed ordinances adopting new regulations that governed the licensing and operation of adult businesses ("Chapter 12.5").

**Former 526**

Former 526.2 limited the number of "adult uses" that could exist on a single lot.  It also prohibited adult entertainment from being located within certain distances of: (1) specified residential zones (2,000 ft); (2) schools, day cares, houses of worship and other specified uses (2,000 ft); and (3) other adult uses (2,500 ft).  (ECF No. 87-3 at 1.)  Former 526.1 contained a classification of "adult entertainment establishments," which included but were not limited to: "cabarets, bookstore, theaters, video stores, peep shows, adult model studios, sexual encounter centers, escort services and motels, as defined herein; and any other establishment which contains activities characterized by the performance,

depiction or description of 'specified sexual activities'[4] or 'specified anatomical areas.'"[5]

*Id.* Former 526 went on to describe specific categories of adult entertainment establishments that were subject to its regulations, including an "adult cabaret," which was defined as follows:

> An establishment whose principal business purpose is the offering to customers of live entertainment which is intended to provide sexual stimulation or sexual gratification to such customers, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas." Establishments that do not provide adult entertainment more than twelve (12) times per calendar year shall not be defined as an adult cabaret.

*Id.* at 5. Former 526.2 also prohibited adult entertainment establishments from hiring minors and required such businesses to allow police and other government authorities to inspect the premises at any time the establishment was open for business. The plaintiffs

---

[4] The term "specified sexual activity" was defined as:

> (a) Human genitals in a state of sexual stimulation or arousal;
> (b) Acts of human masturbation, sexual intercourse or sodomy;
> (c) Fondling or other erotic touchings of human genitals, pubic regions, buttocks or female breasts;
> (d) Flagellation or torture in the context of a sexual relationship;
> (e) Masochism, erotic or sexually oriented torture, beating or the infliction of pain; or
> (f) Erotic touching, fondling or other such contact with an animal by a human being.

(ECF No. 87-3 at 6.)

[5] The term "specified anatomical areas" was defined as:

> (a) Less than completely and opaquely covered human genitals, pubic region, buttocks, anus, or female breasts below a point immediately above the top of the areolae; or
>
> (b) Human male genitals in a discernibly turgid state even if completely and opaquely covered.

*Id.*

allege that under Former 526, less than 400 acres (0.06%) out of more than 685,000 acres in unincorporated Horry County met the requirements to serve as a location for an adult entertainment establishment.

## Current 526

On September 3, 2013, the Horry County Council amended Chapter 526 via Ordinance 30-13. (ECF No. 48-3.) The newly amended Chapter 526 amended 526.1 to add a section entitled "Purpose, Findings and Rationale; Nonconforming Adult Entertainment Establishments." *Id*. at 3. Subsection A contained a statement of purpose, which indicated that the Chapter was intended to, "regulate adult entertainment establishments in order to promote the health, safety, and general welfare of the citizens of the county, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of adult entertainment establishments within the county." *Id*. The provision also specifically stated that it had "neither the purpose nor effect" of "imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually-oriented materials," or "deny[ing] access by adults to sexually-oriented materials protected by the First Amendment, or "deny[ing] access by the distributors and exhibitors of sexually-oriented entertainment to their intended market." *Id*.

In Subsection B, the county council made the following findings, which it claims are supported by a long list of cases and studies cited in the ordinance:

(1) Adult entertainment establishments, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and

exploitation. Alcohol consumption impairs judgment and lowers inhibitions, thereby increasing the risk of adverse secondary effects.

(2) Adult entertainment establishments should be separated from sensitive land uses to minimize the impact of their secondary effects upon such uses, and should be separated from other adult entertainment establishments, to minimize the secondary effects associated with such uses and to prevent an unnecessary concentration of adult entertainment establishments in one (1) area.

(3) Each of the foregoing negative secondary effects constitutes a harm which the county has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the county's rationale for this ordinance, exists independent of any comparative analysis between sexually-oriented and non-sexually-oriented businesses. Additionally, the county's interest in regulating adult entertainment establishments extends to preventing future secondary effects of either current or future adult entertainment establishments that may locate in the county. The county finds that the cases and documentation relied on in this ordinance are reasonably believed to be relevant to said secondary effects.

*Id.* at 5.

The plaintiffs imply that these findings and the changes made to Chapter 526 were implemented because the county council was advised that, as written, Chapter 526 would not pass constitutional muster.

The Horry County Council modified Former 526 by relaxing the space restrictions for the operation of adult entertainment establishments.  Whereas the former regulations required a 2,000-ft. separation from sensitive land uses such as churches, schools, and residential zoning districts, Ordinance 30-13 reduced that separation requirement to 1,500 feet. (ECF No. 48 at 8-9.).  And whereas the former regulations required a 2,500-ft. separation between adult entertainment establishments, Ordinance 30-13 reduced the required separation to 750 feet.  *Id.* at 9.  Ordinance 30-13 leaves 79 parcels on more than 415 acres—many in prime commercial areas—available in Horry County for adult

6

businesses to operate as a matter of right. (Ex. 9; see also Ex. 17 at 108-111 (discussing available sites in Horry County).)

The new ordinance also amended the definitions used to classify adult entertainment establishments.  For the purposes of this case, the following changes are relevant:

1. Current 526 eliminated the definition of an adult entertainment establishment that had previously existed as 526.1 and replaced it with the following definition, in the "Definitions" section in 526.2:

   "*Adult entertainment establishment*" means an "adult bookstore or adult video store," an "adult cabaret," an "adult motion picture theater," a "semi-nude model studio," or a "sex paraphernalia store."

2. Current 526 eliminated the previous definition of an "adult cabaret" and replaced it with the following definition:

   "Adult cabaret" means a nightclub, bar, juice bar, restaurant, bottle club, or similar commercial establishment that regularly features live conduct characterized by semi-nudity.[6] No establishment shall avoid classification as an adult cabaret by offering or featuring nudity. [7]

---

[6] The terms "semi-nude" and "semi-nudity" were defined in Current 526 as follows:
"*Semi-nude or semi-nudity*" means the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks. This definition shall include the lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breasts exhibited by a bikini, dress, blouse, shirt, leotard, or similar wearing apparel provided the areola is not exposed in whole or in part.

(ECF No. 91-2 at 7.)

[7] The term "nudity" was defined in Current 526 as follows:
"Nudity" means the showing of the human male or female genitals, pubic area, vulva, or anus with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola.

*Id.*

7

(ECF No. 48-3 at 6.)

## Chapter 12.5

The Horry County Council also passed Ordinance 29-13, creating Chapter 12.5 of the Horry County Code, which sets forth licensing requirements and regulations for adult entertainment establishments. (ECF No. 48-2 at 1.)  The ordinance contains statements of purpose and findings that appear to be identical to those added to Chapter 526.  The Ordinance explains the requirements and application/issuance process for an "adult entertainment establishment license" and "adult entertainment establishment employee licenses," as well as fees and inspection requirements. (ECF No. 48-2 at 11-15.)  The most relevant substantive provisions are summarized below:

1. Prohibition of Nudity and Specified Sexual Activity – Section 12.5.157(a) provides that "No patron, employee, or any other person shall knowingly or intentionally, in an adult entertainment establishment, appear in a state of nudity or engage in specified sexual activity."[8]
2. Space and Contact Restrictions - 12.5.157 requires any entertainer who is semi-nude to be more than 6 feet from any patron and on a stage at least 18 inches high, prohibits an employee who appears semi-nude from knowingly touching a patron or his or her clothing.  The plaintiffs argue that this effectively prohibits an entertainer from being tipped by a patron.
3. Limited Hours of Operation – Section 12.5.151 restricts the hours during which adult entertainment establishments may operate, providing that "no adult entertainment establishment shall be or remain open for business between 12:00 midnight and 6:00 a.m. on any day."
4. Operator Presence - 12.5.157 prohibits the operator of an adult entertainment establishment from allowing a room on the premises to be occupied by an

---

[8]  As in Chapter 526, the term "specified sexual activity" is defined for the purposes of Chapter 12.5 as:

        (a) Intercourse, oral copulation, masturbation or sodomy; or
        (b) Excretory functions as a part of or in connection with any of the activities described in (a) above.

(ECF 48-2 at 10.)

employee who is semi-nude or who appears semi-nude and a patron without the operator[9] of the establishment being present.

5. Signage and Lighting Requirements – Chapter 12.5 imposes various lighting and signage requirements and mandates that operators take certain actions to prevent loitering.

6. Employee Licensing --Section 12.5.143 requires adult entertainment businesses and their employees, including bus boys, waitresses, bartenders, disc jockeys and doorman, to be licensed.

7. Inspection - Section 12.5.146 authorizes the chief of police, or his agents, to enter the premises, to conduct a warrantless search of the premises and to inspect lists of names and aliases of all of the entertainers that the law requires a business to maintain at any time the business is open.

Pursuant to Section 12.5-156, all pre-existing adult entertainment establishments lawfully operating in Horry County and all adult entertainment establishment employees are to be granted a de facto temporary license to continue operation or employment for a period of 90 days following the effective date of the ordinance. (ECF No. 48-2 at 21.)

**Application of the Ordinances to the Plaintiffs**

On October 24, 2012, Adam Emrick (Emrick) of the Horry County Planning and Zoning Department made an on-site visit to the Gold Club I with Horry County Police.  In a sworn statement, Mr. Emrick describes what he observed at the Gold Club I that was submitted to the Zoning Board of Appeals.  (See ECF No 87-4 at 15.)  Emrick observed numerous female dancers exposing their breasts and wearing only thong underwear that showed their buttocks.  He was approached by a dancer who exposed her bare breasts while stimulating them and suggesting that she "take [him] in the back and get on [his] meat."  He also observed a dancer who performed a lap dance on one of the police

---

[9] The term operator is defined broadly as, "any person on the premises of an adult entertainment establishment who manages, supervises, or controls the business or a portion thereof. A person may be found to be an operator regardless of whether such person is an owner, part owner, or licensee of the business."  (ECF No. 48-2 at 8.)

officers for several minutes.  She was later arrested for prostitution.  He attests that at every table in the establishment at least one female dancer was performing lap dances or engaged in intimate conversation with the patrons.  *Id.*  As a result of these observations, on November 8, 2012, the Planning and Zoning Department sent Rose, the registered agent for both MJJG and RT Entertainment, a cease and desist letter advising him that the Gold Club I was operating as an "adult entertainment establishment (adult cabaret)" in violation of Former 526 because the Jason Boulevard Property was not a location where an adult entertainment establishment could be operated.  (See ECF No. 87-4 at 17.)

Subsequent visits by Horry County Police and staff of the Horry County Planning and Zoning Department on December 1, 2012, January 23, 2012, and February 28, 2013 established that the Gold Club I continued to operate as an adult cabaret despite the cease and desist letter.  The Affidavits of John Danford ("Danford") (ECF No. 87-4 at 19, 22, and 24) attest that on one or more of these occasions women were dancing wearing on panties and pasties, that a dancer was wearing only clear pasties, that dancers were rubbing their breasts and pubic areas against patrons, and that dancers were continuing to offer private, topless lap dances.  Additional cease and desist letters were sent to the Gold Club I.

On November 5, 2012, after Emrick's visit but before receiving the cease and desist letter, MJJG submitted an application to Horry County for a business license, which was required to open the Gold Club II on the Kings Highway Property.  (ECF No. 87-4 at 4-6.)  The County's Planning and Zoning Department denied the application on November 15, 2012 because the department had not received a certificate of zoning compliance for

the property, which would show that the proposed use satisfied the zoning code. *Id.*
MJJG sought to remedy that problem by filing an application for zoning compliance a
month later. *Id.*; (Tr. 42; Pl. Ex. 5). The defendant Rennie Mincey ("Mincey"), the
County's zoning administrator, denied MJJG's application for zoning clearance to open a
restaurant/nightclub on the grounds that MJJG was going to operate an, "adult
entertainment establishment." In a letter denying the application, Mincey wrote:

> This letter is in response to your request for a certificate of zoning
> compliance approving The Gold Club to be located at 9719 N. Kings
> Highway, Myrtle Beach. It has been determined that The Gold Club is an
> adult entertainment establishment. This parcel does not meet the location
> requirements as outlined in Article V, Section 526.2(C) of the Horry County
> Zoning Ordinance for this use type. Therefore the request for the issuance
> of a certificate of zoning compliance is denied.

Pl. Ex. 6.

Mincey concluded that the Gold Club II was an "adult entertainment establishment"
based on the observations of staff who visited the Gold Club I on Jason Boulevard and
based on information from the Gold Club website. (ECF No. 87-4 at 5.) The website for
the Gold Club franchise lists locations in numerous states and claims that they are "the
gold standard in adult entertainment." (See ECF No. 87-4 at 31-33.)

While the plaintiffs claim that the Gold Club I (and other similar establishments in
the area) had been operating for eight years with the full knowledge of the Horry County
Police,[10] zoning compliance records for the Gold Club (and its predecessors "Taj Mahal"

---

[10] According to the plaintiffs, County officials, including members of the Horry County Police
Department, walked through and inspected the Gold Club several times each year, and until
shortly before this lawsuit was filed, each of those inspections and visits was without incident or
any claim made by Horry County that the Gold Club I was not in compliance with the law. (Tr. at
35-37.)

and "The Platinum Club") indicated that they were not authorized to operate as adult entertainment establishments, which would include an adult cabaret. (*See* ECF 87-4 at 34-37.) Mincey concluded that the Gold Club II would also be an adult cabaret like the Gold Club I and, accordingly, denied its application for zoning clearance. (Pl. Ex. 23 at 53-55.)

Following Mincey's decision, MJJG and Restaurant Row appealed her denial of zoning clearance to the County's Board of Zoning Appeals, which divided 4-4 on the issue. Because a majority vote from the Board was needed to overturn the administrator's decision, the tie vote served to affirm the decision. The Board's decision is set forth in an order dated March 11, 2013. (See 87-4 at 3-6.) The plaintiffs subsequently filed this action on April 3, 2013.

On August 5, 2013, MJJG submitted a second application for zoning clearance to operate a restaurant/nightclub at its proposed location. MJJG expressly stated in an addendum to its application that it would abide by the Zoning Administrator's interpretation of Section 526 of the zoning code unless and until it obtained relief from the Court. (Pl. Ex. 7.) On September 4, 2013, the defendants advised the plaintiffs that they should submit a new application because the laws had changed by virtue of the adoption of Ordinances 29-13 and 30-13 the day before. (Pl. Ex. 8; Tr. at 51-52.)

The plaintiffs sought a preliminary injunction while the case was pending before Judge Lewis. Judge Lewis issued a clear and thorough order analyzing the plaintiffs' claims and ultimately rejecting the motion for a preliminary injunction. *See MJJG Rest., LLC v. Horry Cnty., S.C.*, 11 F. Supp. 3d 541 (D.S.C. 2014). On summary judgment, the Court agrees with most of the conclusions that Judge Lewis made regarding the merits

of the plaintiffs' case in her order.  Nevertheless, the Court is cognizant that the applicable standard of review and burden of proof on a motion for summary judgment are different than they are on a motion for a preliminary injunction.  Thus, while the Court will cite and incorporate portions of Judge Lewis's analysis, which it finds persuasive and helpful, the Court is under no illusion that Judge Lewis's analysis is dispositive of the motion at hand.

## STANDARD OF REVIEW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or  "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

## DISCUSSION

"As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear."  *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).  It is well-established that the protections of the First Amendment apply to sexual or erotic expression, provided that the expression is not obscene.  *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002) (observing that "[t]he Constitution protects not just political and ideological speech, but also live entertainment, including nude dancing and other performances involving nudity or other sexual elements" (quoting *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65–66 (1981)).  Nevertheless, courts have afforded forms of expression, such as nude dancing, less

14

protection than other forms of pure speech.  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."); *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 744 (4th Cir. 2010) ("[N]ude dancing is only marginally of First Amendment value and only within the outer ambit of the First Amendment's protection." (quotation marks and citations omitted)).

**1.  Zoning Compliance Process Did Not Act as a Prior Restraint**

The plaintiffs have alleged that the zoning compliance process at issue in this case operated as a prior restraint on speech in violation of the First Amendment.  (See, e.g., Am. Compl. ¶ 12 ("The effect of the zoning administrator's decision is to prevent the plaintiff from opening its doors in the first instance, and thus, imposing a prior restraint on protected expression. For, without a certificate of zoning compliance, the plaintiff is precluded from presenting *any* sort of constitutionally protected entertainment at its premises or opening its restaurant and nightclub at all.").)  The plaintiffs allege that the defendants' denial of their second application for zoning clearance was also a prior restraint.  (Am. Compl. ¶ 108.)

In denying the plaintiffs' request for a preliminary injunction, Judge Lewis concluded that "[t]he zoning compliance process at issue here is not properly analyzed as a prior restraint."  (ECF No. 79 at 15.)  The undersigned reaches the same conclusion at the summary judgment stage.  The fact that a zoning regime requires businesses to apply for a license and demonstrate that they are a permitted use before operating does not, without more, make the zoning laws a prior restraint.  As the Supreme Court observed, in *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976), "[t]he mere fact that

the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." *Id.* at 62.

Despite some factual differences in the case at hand, the Court finds the Fourth Circuit's decision in *Mom N Pops, Inc. v. City of Charlotte, N. C.*, 1998 WL 537928 (4th Cir. Aug. 19, 1998) (unpublished decision) to be instructive.  In *Mom N Pops*, the plaintiff argued that the defendants had imposed a prior restraint by requesting additional information from the plaintiff after the previous tenant in the plaintiff's proposed retail space was shut down for violation of a zoning ordinance that prohibited an adult business from operating in there.  *Id.* at *4.  The zoning authorities suspected that the plaintiff was associated with the previous tenant and requested additional information about the proposed establishment.  At this point, the plaintiff brought suit, alleging, among other things, the process for verifying compliance with the zoning regulation constituted a prior restraint.  The Fourth Circuit rejected the argument.  "We agree with the lower court that the challenged ordinance has as its sole purpose to determine the kind of business that a proposed business, such as Mom N Pops, intends to operate, and that the zoning administrators have no discretion as to whether the proposed business will be allowed to operate at the proposed location."  *Id.*

Likewise, this Court concludes that the zoning ordinances at issue in this case have as their sole purpose to determine the nature of a proposed establishment.  They do not prohibit the operation of adult businesses, they simply regulate when and where those businesses may operate.  The record indicates that the zoning administrator, Mincey, denied the plaintiffs' application to run a restaurant and bar (that would be known

as the Gold Club) because the operation of an adult business in the proposed location would violate the applicable zoning ordinances. MJJG objects to this determination as a prior restraint because its application was for a license to operate a restaurant and bar, which would have been in compliance with the zoning ordinances. Mincey knew, however, that MJJG had been operating the Gold Club I and calling it a "restaurant and bar," despite being advised that it was "an adult cabaret" and being directed to cease and desist. It was not up to Mincey to decide whether or not an adult cabaret could operate on the Kings Highway Property. That question was clearly answered by the zoning ordinance, and the answer was "no." Mincey simply had to decide whether the Gold Club II was an adult cabaret, i.e., "to determine the kind of business" proposed.

Mincey suspected that the Gold Club II would be an adult cabaret based on her conclusion that the Gold Club I was an adult cabaret. A review of the record, including pages from the Gold Club's website and the affidavits provided by the zoning authority staff who visited the Gold Club I, leaves very little doubt about the nature of the businesses that were being run and proposed. The Gold Club held itself out as "the gold standard in adult entertainment," so it can hardly claim that it was not the type of business contemplated by the terms "adult entertainment establishment" and "adult cabaret." Rose, who operated the Gold Club I and proposed to open the Gold Club II, testified that his clubs regularly provided entertainment by dancers who were either topless or wearing only a pasty:

A:    Yeah, we offer topless or with pasty, correct.

Q:    Every night?

A:    Every night.

(Rose Dep. at 128.)  The Emrick and Danford Affidavits indicate that the dancers at the Gold Club I were topless or wearing only pasties, and, at least in some instances, were offering lap dances and more.  Thus, Mincey reasonably concluded that the Gold Club I was not just a "restaurant and bar," but an adult cabaret, and, in light of the evidence she had, reasonably concluded that the Gold Club II would also be an adult cabaret.[11]

The fact that Mincey made this determination before the Gold Club II had been able to open its doors does not, without more, render the application of the ordinance a prior restraint.  As the Fourth Circuit explained in *Mom N Pops, Inc*, "the fact that an ordinance anticipates that a Zoning Administrator will gather certain information in an effort to enforce a permissible time/place/manner restriction does not, in and of itself, render the ordinance a "prior restraint."  *Mom N Pops, Inc,* 1998 WL 537928, at *4.  In another similar case, the Sixth Circuit found no prior restraint where city officials had a "substantial basis" for believing that the applicant was planning to operate an adult business in violation of the zoning ordinance and delayed the issuance of a building permit.  *See Christy v. Randlett*, 932 F.2d 502, 505 (6th Cir. 1991).

Finally, the Court finds the authority relied upon by the plaintiffs in support of their prior restraint arguments to be distinguishable.  *See Near v. Minnesota*, 283 U.S. 697 (1931) (invalidating a statute that authorized injunctions of allegedly libelous newspaper articles despite the fact that the publisher had the opportunity to demonstrate that article was true and non-malicious); *New York Times Co. v. United States*, 403 U.S. 713 (1971) ("refusing to enjoin publication of the *Pentagon Papers*"); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (striking down a city's decision not to issue a permit for

---

[11] The plaintiffs argue that the term "adult cabaret" is unconstitutional overbroad or void for vagueness, but, as discussed below, the Court finds these arguments unpersuasive.

presentation of the musical "Hair" on the grounds it was obscene).  While all of these cases involved prior restraints, none of them involved zoning laws.

To be clear, this Court is not suggesting that a zoning ordinance may never be used in such way as to make it a prior restraint.  *See Young*, 427 U.S. at 75 (Powell, J. concurring) (insisting that "zoning regulations . . . have no talismanic immunity from constitutional challenge" and concluding that "courts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext for suppressing expression").  Under the facts of this case, however, the Court concludes that the ordinances at issue do not constitute a prior restraint.

## The Current and Former Regulations Are Constitutional

To determine the appropriate level of scrutiny to apply to a law or ordinance that regulates speech, the Court must consider whether the regulation is content-based or content-neutral.  *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).  Content-based regulations trigger strict scrutiny and must be narrowly tailored to promote a compelling government interest and use the least restrictive means available.  *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 353 (2009) ("Content-based restrictions on speech are 'presumptively invalid' and subject to strict scrutiny."); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. *Ibid.*  If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."); *Texas v. Johnson*, 491 U.S. 397, 406 (1989) ("A law *directed at* the

communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.").

By contrast, content-neutral regulations that limit the time, place, or manner in which expression may occur are subject to intermediate scrutiny and are valid provided that they are "narrowly tailored to achieve a substantial government interest, and allow[] ample alternative channels of communication." *Ross v. Early*, 746 F.3d 546, 560 (4th Cir.); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) ("[G]overnment may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.") (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

"[L]ocal governments have an 'undeniably important' interest in combating the adverse secondary effects of adult businesses. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296 (2000). Consequently, "governmental entit[ies] may regulate sexually oriented businesses . . . in an effort to address the undesirable secondary effects associated with them[,]" and such regulations should be treated "as content-neutral because they are justified without reference to the content of the impacted speech." *Chesapeake B & M, Inc. v. Harford Cnty., Md.*, 58 F.3d 1005, 1010 (4th Cir. 1995). "This is so even if the measure identifies the problem outside by reference to the speech inside-that is, even if the measure is in that sense content based." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring). As Justice Kennedy explained in his

concurring opinion, "zoning regulations do not automatically raise the specter of impermissible content discrimination, even if they are content based, because they have a prima facie legitimate purpose: to limit the negative externalities of land use." *Id. at* 449.

The stated purposes of Current 526 and Chapter 12.5 are to "promote the health, safety, and general welfare of the citizens of the County, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of adult entertainment establishments within the County." (See ECF No. 91-1 at 3; ECF No. 91-2 at 3.) In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court considered a zoning ordinance that regulated the location of adult movie theaters. The district court declined to enter a permanent injunction and granted summary judgment for the defendants finding "that the City Council's *predominate* concerns were with the secondary effects of adult theaters, and not with the content of adult films themselves." *Id.* at 47. The Ninth Circuit reversed, deciding that "if '*a motivating factor'* in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision." *Id.* (citation omitted). The Supreme Court rejected this position, citing the "familiar principle of constitutional law that [the] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 48 (quoting *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)); s*ee also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) ("As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.").

In enacting these ordinances, the Horry County Council relied upon a substantial body of research, cases, and other authorities establishing and acknowledging the deleterious secondary effects associated with the operation of adult businesses. (See documents attached to ECF Nos. 87-91.) The plaintiffs have not challenged the accuracy or sufficiency of these authorities. Rather, they attack the following provision in the statement of purpose for Current 526 and Chapter 12.5, which reads:

> Each of the foregoing negative secondary effects constitutes a harm which the City has a substantial interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the City's rationale for this Chapter, *exists independent of any comparative analysis between sexually oriented and nonsexually oriented businesses.*

(ECF No. 48-2 at 5; ECF No. 48-3 at 5-6 (emphasis added).) The plaintiffs seize on the emphasized language, arguing that the defendants have essentially admitted that Horry County "is regulating adult nightclubs not based on a finding that they cause problems that are different from or greater than those associated with nightclubs featuring entertainment that is not sexually oriented." (ECF No. 100 at 23.) Thus the plaintiffs argue that strict scrutiny is warranted.

The Court is not convinced. This same language appears in numerous ordinances that have been challenged, and at least two courts have rejected the precise argument raised by the plaintiffs in this case. *See Metro Pony, LLC v. City of Metropolis*, 2012 WL 1389656, at *7 (S.D. Ill. Apr. 20, 2012); *Ocello v. Koster*, 354 S.W.3d 187, 201 (Mo. 2011). Other courts have upheld ordinances with similar language without specifically addressing this argument. *See Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*, 492 F.3d 1164, 1187 n.9 (10th Cir. 2007); *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., FL*, 2009 WL 4349319, at *6 (M.D. Fla. Nov. 25, 2009) *aff'd sub*

*nom. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla.*, 630 F.3d 1346 (11th Cir. 2011); *Little Mack Entm't II, Inc. v. Twp. of Marengo*, 625 F. Supp. 2d 570, 580 (W.D. Mich. 2008).

The Court concludes that the predominate purpose of the ordinances is to combat the secondary effects associated with adult business.  Like many other ordinances that courts have upheld, these provisions are valid time, place, and manner restrictions subject to intermediate scrutiny.  *See, e.g., Alameda Books, Inc.*, 535 U.S. at 447 (concluding that "the [zoning] ordinance is not so suspect that we must employ the usual rigorous analysis that content-based laws demand in other instances . . . .  it calls for intermediate and not strict scrutiny"); *Renton*, 475 U.S. at 49 (holding that "[z]oning ordinances designed to combat the undesirable secondary effects of [adult] businesses are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations."); *City of McDoogal's E., Inco. v. Cnty. Comm'rs of Caroline Cnty.*, 341 F. App'x 918, 923 (4th Cir. 2009) (affirming the application of intermediate scrutiny to zoning ordinance); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 513 (4th Cir. 2002) (indicating that "measures to regulate sexually explicit entertainment outside the home receive intermediate scrutiny if they are not premised on a desire to suppress the content of such entertainment, but rather to address the harmful secondary effects of such entertainment: higher crime rates and lower property values.").  Accordingly, the Court will apply intermediate scrutiny in evaluating the ordinances.

In determining whether a regulation can withstand intermediate scrutiny, "[t]he key inquiry is whether the regulations (1) are narrowly drawn to serve a substantial governmental interest and (2) allow for ample alternative avenues of communication."

*Chesapeake*, 58 F.3d at 1010; *see also Renton*, 475 U.S. at 50 ("The appropriate inquiry in this case, then, is whether the Renton ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.").

**The Ordinances Serve a Substantial Government Interest**

Under the standard articulated in *Renton* and *Alameda Books*, local governments can rely on "any evidence reasonably believed to be relevant" to demonstrate the interest in preventing sexually oriented businesses' secondary effects. *Renton*, 475 U.S. at 51-52; *Alameda Books*, 535 U.S. at 438 (plurality), 451 (Kennedy, J., concurring). Furthermore, government authorities are "entitled to rely heavily on the experience of, and studies produced by, other cities and states, as well as on court opinions from other jurisdictions, and need not, before enacting such ordinances, conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 (4th Cir. 2009) (quotation marks and citations omitted). The Fourth Circuit has indicated that "while the government must 'fairly support' its policy, it need not settle the matter beyond debate or produce an exhaustive evidentiary demonstration." *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010). Nevertheless, the defendants in this case *have* produced "an exhaustive evidentiary demonstration," which they relied upon in passing the subject ordinances, and their judgment about the need for these ordinances is entitled to deference. *Id.*

Finally, it is well established that local governments have a substantial interest in controlling the negative secondary effects associated with the operation of adult

businesses.  As the Fourth Circuit has observed, "[entertainment such as nude or topless dancing] has a long history of spawning deleterious effects, including prostitution and the criminal abuse and exploitation of young women, and in most cases a city or state need carry only a minimal burden to demonstrate its interest in regulation of such activity." *Legend Night Club v. Miller*, 637 F.3d 291, 299 (4th Cir. 2011) (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC,* 275 F.3d 337, 356 (4th Cir.2001) (citations and quotation marks omitted)).  Consequently, the Court finds that the defendants have satisfied their burden to show that the ordinances serve a substantial governmental interest.

**The Ordinances are Narrowly Tailored**

While a time, place, or manner regulation "must be narrowly tailored to serve the government's legitimate, content-neutral interests," "it need not be the least restrictive or least intrusive means of doing so."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (quotation marks and citation omitted) "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Id.* at 799.  "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."  *Id.* at 491.

The Court finds that the ordinances are narrowly tailored.  As Judge Lewis observed in rejecting the plaintiffs' motion for a preliminary injunction, "ordinances outlining the sorts of regulations at issue in this case have been upheld across the country."  *MJJG Rest., LLC v. Horry Cnty., S.C.*, 11 F. Supp. 3d 541, 565 (D.S.C. 2014);

s*ee, e.g., LLEH, Inc. v. Wichita Cnty., Tex.,* 289 F.3d 358 (5th Cir.2002) (upholding the constitutionally of several regulations adopted by a county regarding sexually oriented businesses to include distance requirements, under which such businesses could not be located within 1,500 feet of a church, residence, school, or other listed establishments, or within one mile of a prison, operating requirements, under which partially or totally nude performers could not be within six feet of patrons and had to be on stages raised at least 18 inches above the floor, and design and layout requirements, under which premises must be configured in such a manner as to give inspecting law enforcement personnel an unobstructed view); *Peek–A–Boo Lounge, Fla.,* 630 F.3d 1346 (upholding constitutionality of ordinance that required semi-nude employees to remain at least six feet from any patron or customer and on a stage at least 18 inches from the floor and in a room of at least 1,000 square feet, prohibited employees from touching customers or customers' clothing, and restricted hours of operation); *Entm't Productions, Inc. v. Shelby County, Tenn.,* 721 F.3d 729 (6th Cir. 2013) (ordinance that in part, requires all adult-oriented establishments and their employees to obtain a license did not violate the First Amendment); *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville and Davidson Cty.,* 274 F.3d 377, 395 (6th Cir. 2001) (considering sexually oriented business licensing provisions and no touch/buffer zone provisions); *Mitchell v. Comm'n on Adult Entm't Establishments,* 10 F.3d 123, 139 (3d Cir. 1993) (upholding an ordinance requiring sexually oriented businesses to be closed from 10:00 PM to 10:00 AM, Monday through Saturday, and requiring them to be closed all day on Sundays and holidays).

**The Ordinances Provide Alternative Avenues of Communication**

As the Supreme Court explained in *Renton*, "[T]he First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 54. "[T]he available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech" *Ross v. Early*, 746 F.3d 546, 559 (4th Cir.) (quotation marks and citation omitted). The defendants submitted the Affidavit of John Danford, a senior planner with the Horry County Planning and Zoning Department, who provided a list of 79 parcels of property in unincorporated Horry County where adult businesses would be allowed to operate under the new ordinances. (See ECF No. 91-6.)

When available properties in Myrtle Beach, North Myrtle Beach, and Atlantic Beach are considered as well as the property in unincorporated Horry County, there are an additional 120 available sites. The defendants argue that since these sites are within the same economic market, they may be considered as well. *See, e.g., Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 942 (9th Cir. 2007) ("At least where we are dealing with "unincorporated" areas, it is appropriate to recognize the likely availability of other locations within the same economic market in neighboring municipalities."). While the Court agrees that it makes sense to consider surrounding economic markets, because the facts must be construed in favor of the non-moving party on a motion for summary judgment, the Court declines to reach the fact-bound conclusion that these other areas should be considered. However, the Court need not consider them to conclude that the alternative sites left available under the new zoning ordinance match or exceed the number of alternative sites found sufficient by the Fourth Circuit in other cases. *See, e.g.,*

27

*Allno Enterprises, Inc. v. Baltimore Cnty., MD*, 10 F. App'x 197, 203 (4th Cir. 2001) ("[W]e conclude that there are at least eleven available sites. As such, it is clear that the three adult business-Appellants here have more than adequate alternative avenues of communication.").

At the hearing on the motions for summary judgment, the plaintiff essentially argued that, regardless of how much property is available, it is not worth it to relocate because the midnight closing time, space restrictions, touching restrictions, and license requirements make it commercially impracticable to run a profitable business. As noted above, all of the restrictions imposed by the ordinances have been upheld in other cases. Moreover, numerous courts have rejected the notion that time, manner, and place restrictions are unconstitutional because they damage the economic viability of adult businesses. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir. 1993), *as amended* (Apr. 27, 1993) (holding that "it is not relevant whether a relocation site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business."); *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 30 (2d Cir. 2010) (describing the "legal irrelevance of commercial viability concerns").

Furthermore, to the extent the plaintiffs are trying to use Justice Kennedy's concurrence in *Alameda*, which addressed a zoning regulation, to suggest that a regulation on conduct is unconstitutional if it harms the profitability of the adult business model, such an argument has been firmly rejected. For example, in overruling a challenge to an Arizona ordinance that required sexually oriented businesses to close between the hours of 1.00 a.m. and 8:00 a.m. on Monday through Saturday and between the hours of

1:00 a.m. and 12:00 noon on Sunday, the Ninth Circuit held, "to the extent Justice Kennedy's concurrence worked any change in the traditional *Renton* framework, we are satisfied that his proportionality analysis does not apply to the particular type of regulation that we deal with here." *Ctr. For Fair Pub. Policy v. Maricopa Cnty., Arizona*, 336 F.3d 1153, 1163-64 (9th Cir. 2003). The court went on to observe that "[w]hile the constitutionality of hours of operation restrictions on sexually-oriented businesses is an issue of first impression in this circuit, six other circuits have had occasion to consider similar restrictions, and all have found such restrictions to be constitutional under the "secondary effects" test first enunciated by the Supreme Court in *Renton*." *Id.* at 1159 (citing *DiMa Corp. v. Town of Hallie,* 185 F.3d 823 (7th Cir. 1999); *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358 (11th Cir. 1999); *Richland Bookmart Inc. v. Nichols,* 137 F.3d 435 (6th Cir. 1998); *Nat'l Amusements Inc. v. Town of Dedham,* 43 F.3d 731 (1st Cir. 1995); *Mitchell v. Comm'n on Adult Enter. Est. of the State of Delaware,* 10 F.3d 123 (3d Cir. 1993); *Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074 (5th Cir. 1986)). For the reasons stated above, the Court rejects the plaintiffs' arguments that the zoning ordinance fails to leave open alternative avenues of communication and that Chapter 12.5 is unconstitutional because it makes the plaintiffs' business model unprofitable.

**Equal Protection**

Having determined that the ordinances survive intermediate scrutiny and do not violate the First Amendment, the Court is confident that the plaintiffs' equal protection claim (which would be evaluated under a rational basis standard) must fail as well. *See Renton*, 475 U.S. at 55 ("As should be apparent from our preceding discussion, respondents can fare no better under the Equal Protection Clause than under the First

Amendment itself.").  The plaintiffs do not appear to have contested this argument in their briefing or at the hearing.

## Overbreadth and Vagueness Claims

As an initial matter, the Court notes that the plaintiff's overbreadth and vagueness claims are predominantly or exclusively directed at Former 526, which has been repealed. The potential significance of these arguments lies in the plaintiff's attempt to qualify as a prior existing use.  The plaintiffs argue that Former 526 was unconstitutional and thus void, and, therefore, the plaintiffs were legally operating as a restaurant and bar since there was no requirement that adult businesses be classified separately.

## Overbreadth Claims

A plaintiff challenging a law on its face bears a "heavy burden," *North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274 (4th Cir. 2008), because facial invalidation is "strong medicine to be applied sparingly and only as a last resort." *United Seniors Ass'n v. Social Sec. Admin.,* 423 F.3d 397, 406 (4th Cir. 2005) (quotation marks omitted).  This is especially true where the ordinance in question regulates conduct as well as speech. *See Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) ("[W]here conduct and not merely speech is involved, . . . the over-breadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.") (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973)).   "[T]he mere fact that one can conceive some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "[t]here must be a *realistic* danger that the statute itself will significantly compromise recognized First Amendment protections of

parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at

801. Moreover, where a law is "readily susceptible to a narrowing construction that would

make it constitutional, it will be upheld." *Virginia v. American Booksellers Ass'n*, 484 U.S.

383, 397 (1988) (quotation marks and citations omitted).

The plaintiffs argue that portions of Former 526.1 were overbroad because the

definition of an "adult entertainment establishment" encompasses a wide range of

conduct that is clearly protected by the First Amendment. Indeed, the plaintiffs argue that

the application of the definition would have the following implications:

> if any restaurant, theater, comedy club or other mainstream establishment
> presented a performance, no matter how artistic, with a fleeting incident of
> nudity, that establishment fell within the scope of an adult entertainment use
> and was required to meet the zoning code's separation restrictions in order
> to present that entertainment lawfully.

(ECF No. 101-1 at 13.)

> Q. So getting back, then, to my example, if someone on stage erotically
> touches her buttocks, then that would constitute a specified sexual activity
> during the course of a dance performance, correct?
>
> A. If it was an erotic touching, yes.

*Id.* (quoting Mincey Dep. at 93-95.)

The Court is not convinced that a fair reading of Former 526 would actually compel

these conclusions. As noted above, it is not enough that the challenged regulation *could*

be interpreted and applied in ways that would be impermissible; there has to be a "realistic

danger" that First Amendment rights will be infringed. *See Taxpayers for Vincent*, 466

U.S. at 800; *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (noting that an "overbreadth

claimant bears the burden of demonstrating, from the text of the law and from actual fact,

that substantial overbreadth exists.") (quotation marks and citation omitted).

The Court agrees with Judge Lewis's initial assessment that the plaintiffs are stretching Former 526 beyond its scope in an attempt to prove that it is invalid.

> Although Plaintiffs make a broad facial attack on the zoning ordinance, the regulation at issue is far narrower than a regulation applicable to the general public—it concerns the location of "adult entertainment establishments" in Horry County that regularly depict specified sexual activities or specified anatomical areas. Plaintiffs have not shown that the potentially overbroad applications are substantial—performances and conduct occurring outside of an adult cabaret as it is defined are unaffected by the Ordinance, and those occurring in such an adult entertainment establishment containing the sexual emphasis that defines an "adult cabaret" would be within the Ordinance's legitimate sweep.

*MJJG Rest., LLC v. Horry Cnty., S.C.*, No. CIV.A. 4:13-885-MGL, 2014 WL 1314445 (D.S.C. Mar. 28, 2014).  Thus, the Court concludes that Former 526.1 is not unconstitutionally overbroad.

Additionally, the Court finds that the plaintiffs lack standing to challenge the portion of Former 526 that they claim is unconstitutionally broad (the definition of an "adult entertainment establishment" in Former 526.1).  This is because the plaintiffs were not classified as merely an adult entertainment establishment or regulated pursuant to the provision discussed above.  *See Covenant Media Of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 429-30 (4th Cir. 2007) ("Although there is broad 'latitude given facial challenges in the First Amendment context,' a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions.").  Thus the Court concludes that the plaintiffs lack standing to challenge Former 526.1.

As the discussion above makes clear, the plaintiffs focus their overbreadth challenge on Former 526.1 and its catch-all provision applicable to "any other establishment which contains activities characterized by the performance, depiction or

description of 'specified sexual activities' or 'specified anatomical areas.'" (ECF No. 87-3 at 1.) However, it does not appear that this provision was applied to the plaintiffs. The Gold Club I was explicitly advised in the cease and desist letters that it was considered "an adult cabaret," which is defined in Former 526.3 as follows

> An establishment whose principal business purpose is the offering to customers of live entertainment which is intended to provide sexual stimulation or sexual gratification to such customers, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas." Establishments that do not provide adult entertainment more than twelve (12) times per calendar year shall not be defined as an adult cabaret.

*Id.* at 5. While an "adult cabaret" is a sub-category of an "adult entertainment establishment" under Former 526, it is defined much more narrowly than the general category, and does not require application of Former 526.1. The Court finds that Former 526.3 is not overly broad, and the Gold Club I clearly falls within its definition. *See, e.g., Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512, 528-31 (6th Cir. 2009) (rejecting overbreadth and narrow tailoring challenges to "adult cabaret" definition limited to establishments that regularly feature semi-nude entertainment).

The Court also concludes that the plaintiffs involved in the proposed development of the Gold Club II (MJJG and Restaurant Row) lack standing to challenge Former 526.3. As the defendants explain:

> To have standing to challenge the "adult cabaret" definition in the former Section 526.3 as overbroad on its face, Gold Club 2 must admit that it falls within the definition. However, that definition is clearly limited to establishments regularly offering erotic entertainment through live performances characterized by nudity and sexual activity, i.e., sexually oriented entertainment. Under *American Mini Theatres* and *Mom N Pops*, such an establishment lacks standing to challenge the definition—which plainly applies to it—as unconstitutionally overbroad based on how it might be applied to third parties not before the Court.

The Court agrees with the defendants' analysis and rejects the plaintiffs' overbreadth challenges to Former 526. *See Mom N Pops, Inc.*, 162 F.3d at 1155 ("In *American Mini Theatres,* the Court found that where an ordinance clearly applied to the plaintiff, the plaintiff lacked standing to challenge the ordinance based on vagueness or overbreadth."). Furthermore, as noted, the Court finds that 526.3 is not overly broad. Finally, to whatever extent the plaintiffs challenge the current ordinances as overbroad, the claims fail on the merits.

**<u>Vagueness Claims</u>**

The Court finds that the plaintiffs lack standing to challenge the ordinances on vagueness grounds for the reasons stated above. However, even if the plaintiffs did have standing to bring a vagueness challenge, their argument fails on the mertis. "'A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *U.S. v. Lanning*, 773 F.3d 476, 482 (4th Cir. 2013) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). At the same time, "[a] statute need not spell out every possible factual scenario with celestial precision to avoid being struck down on vagueness grounds." *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008) (quotation marks and citation omitted).

The plaintiffs focus their vagueness challenge on the definition of an "adult cabaret" in former Section 526. The plaintiffs argue that the phrase, "An establishment whose principal business purpose is the presentation of live entertainment which is intended to provide sexual stimulation or sexual gratification to its customers," is inapplicable and

unconstitutionally vague because the principal purpose of the Gold Club is the sale of food, alcohol, and admissions tickets.  (ECF No. 100 at 19).  Additionally, the phrase "intended to provide sexual stimulation or sexual gratification to its customers" is "incapable of any objective meaning or determination" because erotic entertainment, like other entertainment, can be presented for a wide range of reasons and elicit a wide range of responses.  (*Id.*).  The Court finds these arguments to be unpersuasive.  Judge Lewis rejected the arguments describe above, citing numerous cases that had sustained regulations with similar language:

> The Court concludes that the challenged phrases are sufficiently specific and precise to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. *See Wag More Dogs, Ltd. Liability Corp. v. Cozart,* 680 F.3d 359, 371 (4th Cir. 2012); *Imaginary Images, Inc.,* 612 F.3d at 750 (rejecting adult entertainment establishment's vagueness challenge as "wishful thinking" because it was clear what conduct the mixed beverage policy reached and what the dancers did because the terms were matters of every day speech and of common usage). As to the first point, the district court in *Mom N Pops* rejected a facial challenge to an adult entertainment definition employing the "principal business purpose" limiting language and the same outcome is warranted here. *See Mom N Pops,* 979 F.Supp. at 392 (acknowledging several cases which have upheld similar language). Secondly, an ordinary person would know the meaning of the terms "sexual stimulation or gratification." These terms have been found to be commonly understood—and therefore constitutional—in several cases. *See Ward v. County of Orange,* 55 F.Supp.2d 1325, 1334 (M.D.Fla. 1999) (rejecting vagueness challenge to these same two terms), aff'd in relevant part, remanded in part, 217 F.3d 1350, 1356 n. 5 (11th Cir. 2000); *see also Stansberry v. Holmes,* 613 F.2d 1285, 1290 (5th Cir. 1980) (noting that such terms are not vague); *SDJ, Inc. v. City of Houston,* 636 F.Supp. 1359, 1367 (S.D.Tex. 1986) (same), aff'd, 837 F.2d 1268 (5th Cir. 1988).  *MJJG Rest., LLC v. Horry Cnty., S.C.*, No. CIV.A. 4:13-885-MGL, 2014 WL 1314445 (D.S.C. Mar. 28, 2014)

*MJJG Rest., LLC*, 2014 WL 1314445.

The plaintiffs seek to distinguish the cases cited by Judge Lewis (*Ward, Stansberry,* and *SDJ, Inc.*) on the grounds that the regulation at issue in *Ward* defined

the terms "sexual stimulation" and "sexual gratification" and that the terms were not at issue in *Stansberry,* and *SDJ, Inc.*  The Court agrees that the code provision at issue in *Ward* defined the terms "sexual stimulation" and sexual gratification" and is thus distinguishable.  On the other hand, the definitions in the regulation at issue in *Ward* are in keeping with the ordinary understanding of the terms, sexual stimulation" and sexual gratification," *Ward*, 55 F. Supp. 2d at 1330.  Moreover, the Court disagrees with the plaintiffs that the terms were not at issue in *Stansberry*.  While the terms ""sexual stimulation" and sexual gratification," were not the terms that the plaintiff had challenged as vague, they were used to define a category ("sexually oriented commercial enterprise") that the plaintiff had challenged as vague, and they were found to be sufficiently clear to support a finding that the category was not unconstitutionally vague.  Likewise, in this case, the terms "sexual stimulation" and "sexual gratification" are used to give meaning to a category (adult cabaret), and the Court finds that they are not unconstitutionally vague.  Furthermore, the holding in *SDJ, Inc.* implies that the phrase "intended to provide sexual stimulation or sexual gratification" has a sufficiently clear meaning to encompass strip clubs.  *SDJ, Inc. v. City of Houston*, 636 F. Supp. 1359, 1373 (S.D. Tex. 1986) ("Plaintiffs contention that their topless dancing bars do not provide a service which is intended to provide sexual stimulation or sexual gratification to its customers is untenable.").

Additionally, the Court rejects the claim that the term "primary business purpose" is vague or inapplicable because the plaintiffs claim that the primary business purpose of the Gold Clubs is or would be the sale of food, alcohol, and admissions tickets.  Those may be the channels through which the business makes money, but that is not what it

holds itself out as doing.  Its mission, goal, and purpose, as conveyed to its customers and the rest of the world, is to be "the gold standard in adult entertainment."  While the Court will admit that the language of Former 526 is not a model of clarity and precision, it is sufficiently specific to provide a person of ordinary intelligence a reasonable opportunity to understand what is prohibited, or perhaps more accurately, what type of businesses may or may not operate on a given parcel.

The plaintiffs also claim that the term "adult entertainment" is vague in the former "adult cabaret" definition, which states that "[e]stablishments that do not provide adult entertainment more than twelve (12) times per calendar year shall not be defined as an adult cabaret." (ECF No. 87-3 at 6.)  The Court concludes that, "adult entertainment" refers to the "live entertainment" referenced in the immediately preceding sentence that "is intended to provide sexual stimulation or sexual gratification to such customers, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas." *Id.*  Read in context, the term is not unconstitutionally vague.  For all of these reasons, the defendants are entitled to summary judgment on the plaintiffs' vagueness claims.

**Chapter 12.5 (the Licensing Ordinance) is Not a Prior Restraint**

A licensing ordinance such as the one at issue in this case is constitutional provided that three procedural protections are in place:  "(1) any prior restraint in advance of a final judicial determination on the merits must be no longer than that necessary to preserve the status quo pending judicial resolution; (2) a prompt judicial determination must be available; and (3) the would-be censor must bear both the burden of going to court and the burden of proof in court." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 239

(1990) *holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) (holding that "prompt judicial review" encompasses a "a prompt judicial decision).

As Judge Lewis did, this Court finds that "the licensing ordinance 29–13 does not operate as an unconstitutional prior restraint. Ordinance 29–13 sets forth objective criteria and standards relevant to the issuance of licenses, including a 30–day time period for issuance following the filing of a completed application (Section 12.5–144) and provides for prompt judicial review of an intent to deny, suspend, or revoke a license (Section 12.5–150)." *MJJG Rest., LLC*, 2014 WL 1314445.  Additionally, lawfully operating, preexisting businesses falling within the new definition of adult entertainment establishments are to be entitled to temporary licenses, thereby preserving legal operations and maintaining the status quo. (ECF No. 48–2 at 13 & 21). The status quo is also preserved during the appeals process (ECF No. 48–2 at 17).  For these reasons, the Court concludes that Chapter 12.5 does not operate as an unconstitutional prior restraint.

## Gold Club 1 is Not a Prior Lawful, Nonconforming Use

"The burden of proving a nonconforming use is on the party claiming a prior nonconforming use." *Lake Frances Properties v. City of Charleston*, 561 S.E.2d 627, 630 (S.C. Ct. App. 2002).  The Gold Club I has not established that it is entitled to operate an adult cabaret at the Jason Boulevard Property because it never possessed a right to operate such a business in the first place.  That it operated such an establishment in violation of the ordinance in place at the time does not establish that it has a right to continue to operate such an establishment.  Gold Club 1 has only ever sought, or obtained, a business license to operate as a (non-adult) restaurant/nightclub. It has repeatedly maintained that it was *not* operating an adult cabaret, and the zoning

documents pertaining to that property prohibit the operation of an adult entertainment establishment on the premises. (Ex. 15 at 21-23.). Thus, Gold Club 1 cannot claim detrimental reliance on the former zoning regulation or on permits obtained thereunder. While RT Entertainment argues that Former 526 was unconstitutional and therefore it was void, the Court has not invalidated Former 526 on the basis urged by the plaintiffs.  For the same reason, MJJG and Restaurant Row have no valid basis to claim that the Gold Club II should be allowed to operate on the Kings Highway Property.

## Fourth Amendment Claim Fails

"A broad administrative search of a business will not violate the Fourth Amendment when: (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspection is necessary to further the regulatory scheme; and (3) the 'statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant.'" *Allno Enterprises, Inc. v. Baltimore Cnty., MD*, 10 F. App'x 197, 204 (4th Cir. 2001) (quoting *New York v. Burger,* 482 U.S. 691, 703 (1987)).  The Court agrees with the defendants that the County's administrative inspection provision (Ex. 4 at § 12.5-146) does not implicate the Fourth Amendment or authorize any unreasonable search or seizure.  Rather, the police are allowed to enter the businesses only while it is already open to the public and can only enter the portions of the premises that are open to the public.  *See Andy's Rest. & Lounge v. City of Gary*, 466 F.3d 550, 557 (7th Cir. 2006) (holding that a similar inspection provision did not implicate privacy interests protected by the Fourth Amendment).

## Zoning Appeal is Subject to Dismissal

The Court concludes that Gold Club II's appeal of the March 2013 ZBA decision should be dismissed.  28 U.S.C. § 1367(c) provides that

> "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
>
> . . .
>
> **(3)** the district court has dismissed all claims over which it has original jurisdiction

*Id.*  The Court has dismissed all of the plaintiff's federal claims and declines to exercise supplemental jurisdiction over the zoning appeal.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment (ECF No 87) is granted and the plaintiffs' motion for summary judgment (ECF No. 101) is denied.

**IT IS SO ORDERED.**

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

April 6, 2015
Greenville, South Carolina